IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CORDELL LINDSEY, JR.,           §
and ROBERT L. WILSON,           §
                                §
         Plaintiffs,            §
                                §
v.                              §      CIVIL ACTION NO. H-15-630
                                §
HARRIS COUNTY, et al.,          §
                                §
         Defendants.            §

## MEMORANDUM OPINION

Pending before the court[1] is Defendants Harris County, Ken Jones ("Jones"), and John Ray Harrison's ("Harrison") Motion for Summary Judgment (Doc. 42). The court has considered the motion, Plaintiffs Cordell Lindsey, Jr., ("Lindsey") and Robert L. Wilson's ("Wilson") response, all other relevant filings, and the applicable law. For the reasons set forth below, the court **GRANTS IN PART AND DENIES IN PART** Defendants' motion.

## I. Case Background

Plaintiffs, former officers employed by Harris County Constable's Office Precinct 3 ("Precinct 3"), filed this action against defendants, alleging violations of Title VII of the Civil Rights Act of 1964[2] ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1983 ("Section 1983"), the Age Discrimination

---

[1] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. See Doc. 20, Ord. Dated Aug. 27, 2015

[2] See 42 U.S.C. §§ 2000e-2000e-17.

in Employment Act[3] ("ADEA"), and the Fair Labor Standards Act[4] ("FLSA").

## A.  Factual Background

Both Plaintiffs worked at Precinct 3 at the time of the events underlying this action.  Defendant Jones was the Constable of Precinct 3 throughout Plaintiffs' tenures as employees.  The parties submit a copious amount of evidence, much of it far afield from what is at issue on summary judgment.[5]

### 1.  Plaintiff Lindsey

In early 2001, Plaintiff Lindsey, a black man, went to work for Metropolitan Transit Authority of Harris County ("Metro") as a bus driver and, shortly thereafter, for the Houston Housing Authority ("HHA") as a fraud investigator.[6]  At that time, he had over twenty years of experience in law enforcement, including three years as Chief of Police at Texas Southern University.[7]  In his position with HHA, Plaintiff Lindsey investigated complaints of fraud such as unauthorized occupants, unreported income, and drug

---

[3]    See 29 U.S.C. §§ 621-634.

[4]    See 29 U.S.C. §§ 201-219.

[5]    The court relies primarily on the affidavit and deposition testimony of Plaintiffs Lindsey and Wilson to ascertain whether their claims can survive summary judgment.

[6]    See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 18.

[7]    Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 2.

activities.[8]   He also coordinated the scheduling of off-duty officers from other law enforcement agencies to perform surveillance or special security jobs for HHA.[9]

On August 14, 2001, he took a third job with Precinct 3 as a reserve officer.[10]   On September 8 or 9, 2003, Plaintiff Lindsey became a full-time employee of Precinct 3, while continuing to work full time for HHA.[11]   He first served as a full-time relief deputy, working two day shifts, two evening shifts, and one night shift each week.[12]   While working the night shift, he was not provided with backup when requested and was not invited to shift meetings.[13]

After approximately eight months, Plaintiff Lindsey was assigned to the evening shift, which ran from 2 p.m. to 10 p.m. five days a week.[14]   He worked that shift for the remainder of his

---

[8]    Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 22-23.

[9]    See id. pp. 23-25; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J. ¶¶ 22-23.

[10]    See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 18-19.

[11]    See id. p. 19; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 2.

[12]    Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 29.

[13]    See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 64-65; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 5.

[14]    Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 29.

tenure.[15]  At that time, Plaintiff Lindsey continued to work for the HHA full time during the hours of 7 a.m. to 7 p.m. on Mondays and Tuesdays and from 7 a.m. to 1 p.m. on Wednesdays, Thursdays and Fridays.[16]

Plaintiff Lindsey filed a request with Precinct 3 to work for HHA, and it was approved.[17]  He renewed the request once when Precinct 3 enacted a new policy requiring renewal of approvals for outside employment.[18]  Beyond those two instances, no one ever told Plaintiff Lindsey that he needed to submit a new request every ninety days.[19]  Plaintiff Lindsey reasoned, "Since I had been working my job at HHA before I began working at Precinct 3, I did not consider it an 'extra job.'"[20]

In April 2006, Precinct 3 promoted Plaintiff Lindsey to the rank of sergeant, without a corresponding pay increase.[21]  He did not receive pay commensurate with the rank of sergeant until July

---

[15]   Id. pp. 29-30.

[16]   Id. p. 31; see also Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 19.

[17]   See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 88.

[18]   See id.

[19]   See Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 21.

[20]   Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 21; see also Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 88.

[21]   See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 57; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 3.

2009.[22]

In June 2008, Jon Moore ("Moore") assigned Sergeant J.D. Garland ("Garland") to ride with Plaintiff Lindsey, explaining to Plaintiff Lindsey that Garland was a racist and needed retraining.[23] Moore also instructed Plaintiff Lindsey to set Garland's schedule so that he was off on Saturdays, Sundays, and Wednesday evenings so that he could perform a second job as a preacher.[24] In order to follow those instructions, Plaintiff Lindsey rescheduled the regular day off of a black officer, Sherman Eagleton ("Eagleton").[25] Plaintiff Lindsey complained that he believed Garland was given more favorable treatment on the basis of his race.[26]

In March 2010, Precinct 3 promoted Plaintiff Lindsey to the rank of lieutenant, again without a corresponding pay raise.[27] At no point in his employment with Precinct 3 did Plaintiff Lindsey

---

[22]   Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 3.

[23]   See id. ¶ 8; Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 37-38.

[24]   Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 9; see also Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 36-37.

[25]   Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 37; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 9.

[26]   Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 9.

[27]   See id. ¶ 3; Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 57.

ever receive pay commensurate with the rank of lieutenant.[28]

Plaintiff Lindsey remained a non-exempt employee throughout his employment at Precinct 3 but never received formal training on filling out timesheets.[29]  In 2009 or 2010, when Defendant Harris County was in a financial bind, Defendant Jones put all officers on a modified thirty-two-hour workweek.[30]  Defendant Jones informed Plaintiff Lindsey and others in a supervisors' meeting that the officers were not to record overtime and that officers who worked additional hours should be given compensatory time ("comp time") the following day.[31]  But, Plaintiff Lindsey testified, "[n]ine times out of ten, the officers did not get to take the time off, because the schedule would not permit [it]."[32]

Plaintiff Lindsey understood it to be the standard practice throughout Precinct 3, even before the budget constraints, that non-exempt employees were to record no more than eight hours of work each day and forty hours each week, regardless of the number of hours actually worked.[33]   Plaintiff Lindsey followed this

---

[28]    See Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 3.

[29]    Id. ¶¶ 10-11.

[30]    See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 101.

[31]    See id.

[32]    Id. p. 106.

[33]    See id. p. 102; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 11.

6

understanding out of fear of "being retaliated against" and never recorded hours in excess of eight per day or forty per week even when he worked more hours.[34]

The extra hours accumulated when, for example, he received a call late in his shift and worked beyond the end of his shift "to close out the scene of the incident" or to complete the incident report.[35]  As a supervisor, he worked extra hours when he stayed until the officers who reported to him also completed their work.[36] Other situations arose when he worked while off-duty.[37]  For example, he "regularly received telephone calls and e-mails notifying [him] that [he] needed to attend to incidents that would arise when [he] was off-duty."[38]  He also attended community events, such as parades, funerals, and trail rides, outside of his scheduled work time.[39]

When Plaintiff Lindsey claimed overtime for these assignments, Moore told Plaintiff Lindsey to submit a new timesheet without the extra time and to take comp time the following day at a one-for-one

---

[34]     Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 12; see also id. ¶¶ 11, 13.

[35]     Id. ¶ 13(a); see also id. ¶ 13(b).

[36]     See id. ¶ 13(c).

[37]     See id. ¶ 13(d).

[38]     Id. ¶ 13(d).

[39]     See id. ¶ 13(e); Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 114.

hourly rate ("straight time") rather than a time-and-a-half rate.[40] Although he was promised double comp time as an incentive to work holidays, he never received the premium rate.[41] The management team often told him when he needed to use the comp time, instead of allowing him to choose the days when he wanted to use it.[42] Plaintiff Lindsey's opinion was that staffing levels did not play a role in the management team's decisions about when he could take comp time.[43] Out of fear of retaliation, Plaintiff Lindsey did not complain about the comp-time practices.[44]

Defendant Jones's brother, Gary Jones, was the bureau chief over the patrol division for Precinct 3.[45] Throughout the time that Plaintiff Lindsey worked for Precinct 3, Gary Jones regularly told Plaintiff Lindsey racial jokes that Plaintiff Lindsey found offensive.[46] Plaintiff Lindsey never reported Gary Jones's behavior out of fear of retaliation and futility.[47] Garland also told racial

---

[40]   See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 116-17; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 14.

[41]   See id. ¶ 15.

[42]   See id. ¶ 16.

[43]   See id.

[44]   See id. ¶ 17.

[45]   See id. ¶ 6.

[46]   See id. ¶ 7; Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 43-44.

[47]   See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 44; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 7.

jokes, and Plaintiff Lindsey, who was Garland's supervisor and trainer, admonished him but did not report the behavior to anyone else.[48] Plaintiff Lindsey admonished another officer whom he reported to Moore in 2009 or 2010 for making "disparaging racial remarks about minorities and females."[49] Moore said that he would take care of the matter, but Plaintiff Lindsey testified that the racist comments continued until the officer was terminated.[50]

In 2012, Defendant Harrison, who was an Internal Affairs Division ("IAD") investigator, asked Plaintiff Lindsey to attend a meeting regarding a complaint that had been filed against a black officer who was not in Plaintiff Lindsey's chain of command.[51] When Plaintiff Lindsey asked why he needed to attend, Defendant Harrison said, "Because you're a black supervisor."[52] In response, Plaintiff Lindsey complained that he "felt used as a black person."[53]

On April 23, 2013, Plaintiff Lindsey and HHA Asset Manager Rick Johnson ("Johnson") conducted an authorized search of an HHA

---

[48]   See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 38-39.

[49]   Id. p. 39.

[50]   See id. pp. 41-42.

[51]   See id. pp. 51-53.

[52]   See id. p. 52.  The black officer against whom the complaint had been filed served under a black supervisor.  See id.

[53]   See id. p. 53.

property leased to Chassiedy Utley ("Utley").[54] Johnson found "a number of things that were out of compliance in the property including the presence of four . . . bags of marijuana," contraband of which Plaintiff Lindsey took possession "as a law enforcement officer."[55] A later search by Harris County Constable's Office Precinct 6 ("Precinct 6") officers and a canine unit found more marijuana, as well as weapons and evidence that unauthorized persons were residing at the property.[56] The next day, a Precinct 6 officer delivered the seized property to Plaintiff Lindsey without a property release form, and Plaintiff Lindsey delivered all of the seized property to Precinct 3 that afternoon.[57]

Plaintiff Lindsey stated in the incident report that Utley was home at the time of the initial search when, in fact, Plaintiff Lindsey and Johnson entered the property in the presence of Utley's friend whose possessions were found at the residence.[58] Plaintiff Lindsey stated, "I had drafted the report in this way because I wanted to use the report as an investigative tool to assist me in

---

[54]     Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 25; see also Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 161-68.

[55]     Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 25; see also Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 161-68, 174-76.

[56]     Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 26.

[57]     Id. ¶ 27.

[58]     Id. ¶ 28.

questioning Ms. Utley about whether the marijuana was hers."[59]  When Plaintiff Lindsey questioned Utley and her friend, the friend admitted that the marijuana belonged to him, and he was taken into custody.[60]  Plaintiff Lindsey then accessed his initial report to make changes that reflected the actual basis for gaining entrance to Utley's residence and clarified to whom the seized marijuana belonged.[61]

Defendant Harrison notified Plaintiff Lindsey in person that Utley filed a complaint[62] against him based on his treatment of her at the interview.[63]  Plaintiff Lindsey received a written notice of the complaint, which also informed him that he would have to resign from HHA by the end of the month or face termination from Precinct 3.[64]  At a meeting in mid-May 2013, which Plaintiff Lindsey attended with his attorney, Defendant Harrison stated that he had determined

---

[59]  Id.; see also Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 98, 169.

[60]  See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 98; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 29.

[61]  See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 98, 170-71; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 30.

[62]  This was the first complaint that Plaintiff Lindsey had received during his employment at Precinct 3.  See Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 31.

[63]  See id.; Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 75-76, 85-86.

[64]  See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 85-86; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 31.

Utley's complaint was groundless.[65]  Instead of discussing the Utley
complaint, Defendant Harrison asked about Plaintiff Lindsey's
changes to the Utley incident report and about the timesheets of
another Precinct 3 officer who had contracted with HHA.[66]  Because
Plaintiff Lindsey had not been given prior notice, he refused to
any questions on those issues.[67]

Plaintiff Lindsey told Defendant Harrison that Plaintiff
Lindsey "felt that [he] was being told that [he] had to give up
[his] job with HHA because of [his] race and that [he] was opposed
to such discriminatory treatment since non-African American
officers were allowed to have jobs when they were not at Precinct
3 and even had their Precinct 3 schedules adjusted to accommodate
the other jobs that they held."[68]  Defendant Harrison responded
that, if he found any wrongdoing in the investigation of the new
allegations, he going to put Plaintiff Lindsey's "black ass in

---

[65]     See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep.
pp. 96, 97; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J.,
Pl. Lindsey's Decl. ¶ 32.

[66]     See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep.
p. 96; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl.
Lindsey's Decl. ¶ 32.

[67]     See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep.
p. 96; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl.
Lindsey's Decl. ¶ 32.

[68]     Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J.,
Pl. Lindsey's Decl. ¶ 33; see also Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J.,
Pl. Lindsey's Dep. pp. 91-92.

jail."[69]

A week later, on May 24, 2013, Defendant Jones terminated Plaintiff Lindsey "immediately."[70]  In the written notice, Defendant Jones stated, "After reviewing [the IAD report on the Utley complaint,] I believe you have failed to adhere to numerous policies of this department[,] mainly your duties that are set out in General Order 200-8 'Supervisors Responsibility.'"[71]  Plaintiff Lindsey referred to this reason for termination as vague and suggested that Defendant Jones "tried to make it sound like [Plaintiff Lindsey] was being terminated because [he] had refused to answer questions concerning the complaint filed by Ms. Utley during [the] May 16th meeting with [Defendant] Harrison," despite Defendant's Harrison's statement at the meeting that he had already determined the complaint to be groundless.[72]  Plaintiff Lindsey was not allowed a chance to respond to the allegations that formed the

---

[69]    Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 76; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 33.

[70]    Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 34; see also Doc. 53-4, Ex. D to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Decl. of David J. Quan, Attach. 3, Letter from Def. Jones to Pl. Lindsey Dated May 24, 2013.

[71]    Doc. 53-4, Ex. D to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Decl. of David J. Quan, Attach. 3, Letter from Def. Jones to Pl. Lindsey Dated May 24, 2013; see also Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 34.

[72]    Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 34; see also Doc. 53-4, Ex. D to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Decl. of David J. Quan, Attach. 3, Letter from Def. Jones to Pl. Lindsey Dated May 24, 2013.

basis for his termination.[73]

Approximately one month after his termination, Plaintiff Lindsey was indicted for tampering with a government record based on the Utley incident report.[74]   The Harris County District Attorney's office added two additional charges in the subsequent months.[75]   The assistant district attorney ("ADA") persisted in seeking a plea agreement, but Plaintiff Lindsey refused, stating that "[he] had not done anything criminal and [he] wanted to be fully exonerated."[76]

In the fall of 2014, the ADA threatened to file charges against Plaintiff Lindsey's daughter "based on trumped-up allegations that were not related to the charges against [him]."[77] Plaintiff Lindsey testified, "I was forced to accept the [DA's] 'plea bargain' to accept guilty pleas to the tampering with government document case . . . and another charge in exchange for the dismissal of the third case against me and the [DA's] agreement to not prosecute my daughter."[78]   Plaintiff Lindsey agreed to

---

[73]    See Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 36.

[74]    See id. ¶ 37.

[75]    See id.

[76]    See id. ¶ 38.

[77]    Id. ¶ 39.

[78]    Id. ¶ 41; see also Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. pp. 188-90.

14

surrender his peace-officer license.[79]   At the time of the DA's efforts to secure a plea agreement, Plaintiff Lindsey affirmed, he had already filed this action.[80]

### 2.  Plaintiff Wilson

Plaintiff Wilson, a black man, worked as a corrections officer from 1983 to 1998.[81]  In 1990, he graduated from the police academy and began working as a reserve peace officer in Fort Bend County Precinct 2, followed by employment with the Kendleton Police Department and the Harris County Constable's Office Precinct 7 ("Precinct 7") while continuing as a corrections officer.[82]   In 1998, Plaintiff Wilson began a trucking business and then left corrections.[83]

In 1999, he returned to Precinct 7 as a reserve officer and left there to become a reserve officer at Precinct 3 in May 2001.[84] In July 2002, Plaintiff Wilson began working for Precinct 3 as a

---

[79]     See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 188; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 42.

[80]     See Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 43.

[81]     See Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. p. 9.

[82]     See id. pp. 10-12, 14.

[83]     See id. pp. 14-15.

[84]     See id. p. 17.

full-time officer.[85]   He left Precinct 3 in 2009 and became a reserve officer with Patton Village Police Department before returning to Precinct 7.[86]   He returned to the employment of Precinct 3 as a reserve officer in 2010 and became a full-time officer in January 2011.[87]

While working for Precinct 3, Plaintiff Wilson also worked for HHA, as a compliance observer.[88]   Plaintiff Wilson initially filed a request to work for HHA but did not file renewal requests every ninety days because "everybody knew where I worked, and it wasn't a big issue until now."[89]

Throughout his second tenure at Precinct 3, Plaintiff Wilson remained at the rank of deputy, although he "regularly performed supervisor duties and other responsibilities for a rank higher than Deputy."[90]   When he received certification as Master Peace Officer,

---

[85]     See id. pp. 18-19; Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 2.

[86]     See Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. p. 19.

[87]     See id. pp. 20-21; Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 2.

[88]     See Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. p. 111; Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 24.

[89]     Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. pp. 111-12.

[90]     See Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 3; but see Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. p. 52 (indicating that, in 2009, Plaintiff Wilson was demoted from Sergeant to Deputy as discipline after the IAD investigated into a complaint filed against him).

Gary Jones informed him that he would not receive the pay raise normally associated with that achievement until later.[91]  Plaintiff Wilson was not paid at the higher end of the pay range for his rank.[92]

In 2011, Plaintiff Wilson was assigned to the overnight shift under the command of Jasen Rabalais ("Rabalais").[93]  While working on that shift, Plaintiff Wilson did not receive assistance when he requested it.[94]  On one occasion, Plaintiff Wilson heard Rabalais over the radio direct the other officers not to respond to Plaintiff Wilson's request "as they needed to take their meal break."[95]

Plaintiff Wilson remained a non-exempt employee throughout the relevant employment period but never received formal training on filling out timesheets.[96]  He was informed that he was eligible to receive overtime pay if he worked for more than forty hours in a

---

[91]    See Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 3.

[92]    See id. ¶ 4.

[93]    See id. ¶ 5.

[94]    See id.; Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. pp. 153-54.

[95]    Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. pp. 151-52; Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 5.

[96]    See Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶¶ 7-8.

workweek.[97]    However,  he  understood  the  standard  practice  at Precinct 3 was that non-exempt employees were to record no more than  eight  hours  of  work  each  day  and  forty  hours  each  week, regardless of the number of hours actually worked.[98]    Plaintiff Wilson followed this understanding out of fear of "being retaliated against" and never recorded hours in excess of eight per day and forty per week even when he worked more hours than that.[99]

The  extra  hours  accumulated  when,  for  example,  he  received calls  while  off-duty  to  respond  to  a  neighborhood  disturbance between 12:00 midnight and 2:00 a.m.[100]   Responding to such a call took Plaintiff Wilson one to two hours.[101]   He also was asked to represent Precinct 3 at meetings in minority communities that were scheduled when he was off duty and to cover calls in minority areas outside his regular assignments.[102]   Additionally, Plaintiff Wilson was assigned a marked vehicle that he took home, and, during his work commute, he was required to respond to calls and to handle any

---

[97]    See id. p. 7.

[98]    See id. ¶ 9; Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. pp. 108-09, 137.

[99]    Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶¶ 9, 10.

[100]    See id. ¶ 10(a).

[101]    See id.

[102]    See id. ¶¶ 10(b), 10(c).

18

incidents he encountered en route to and from work.[103]  He was told by his supervisor Joe Eaglin, as well as Terry Ganey, Gary Jones, and Moore not to record any of this work on the timesheet.[104]

Plaintiff Wilson also attended community events, such as parades, funerals, and trail rides, outside of his scheduled work time.[105]  He was told that he would receive comp time for these events.[106]  Plaintiff Wilson received comp time for some of the extra work, but not the full amount that he was due.[107]  Although he was promised double pay or equivalent comp time as an incentive to work holidays, he never received the premium rate of pay or comp time.[108]  The management team often told him when he was to use the comp time, instead of allowing him to choose the day when he wanted to use it.[109]  Plaintiff Wilson's opinion was that staffing levels did not play a role in the management team's decisions about when he could take comp time.[110]  Out of fear of retaliation, Plaintiff

---

[103]    See id. ¶ 10(e); Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. pp. 71-72, 108-09.

[104]    See Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶¶ 10(a), 10(b), 10(c), 10(e).

[105]    See id. ¶ 10(d).

[106]    See id.

[107]    See id. ¶ 12.

[108]    See id. ¶ 11.

[109]    See id. ¶ 12.

[110]    See id.

Wilson did not complain about the comp-time practices.[111]

At his deposition, Plaintiff Wilson explained how he understood he should complete his timesheets:

> [W]hen I first came there, they would allow you to work overtime until you get [sic] roughly a hundred hours of comp time, then they will [sic] tell you you can't put it on your time sheet anymore.  So after that, everything you worked, all they wanted you to put on there was a straight eight-hour shift.  And sometimes they would call and ask me to come in the morning a little earlier, and sometimes they would tell me to take off earlier.  But my time sheets still showed two to ten or six to two or whatever.
>
> . . . .
>
> A lot of times they owe[d] me hours and that's when I could remind them that I wanted to take off some of this time you owe me that I have something going on.  And they would tell me I could take off, and my time sheet would still show that I worked for Harris County.[112]

He opined, "[Y]ou can't really rely on Precinct 3 time sheets.  They are not dependable."[113]

Gary Jones told Plaintiff Wilson "a number of offensive racial 'jokes'" during his second period of employment.[114]  Plaintiff Wilson said that he also heard Bob Wooten ("Wooten") tell a story about a call he had in 1969 and used the term "colored," which

---

[111]  See id. ¶ 13.

[112]  Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. pp. 129, 132.

[113]  Id. p. 140.

[114]  Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 6; see also Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. p. 86.

offended Plaintiff Wilson.[115]   Periodically, Wooten referred to
Plaintiff Wilson as "boy."[116]    According to Plaintiff Wilson,
Rabalais also made comments about neighborhoods and prisoners that
Plaintiff Wilson understood to be racially discriminatory.[117]

In June 2008, Plaintiff Wilson received a written warning for
"working apartment security for a free room," which "was being used
as a meeting place for females."[118]  In July 2008, Plaintiff Wilson
received another written warning for not attending an assigned
meeting because he was working an extra job.[119]   Also, while he
served as a deputy at Precinct 3, Plaintiff Wilson was the
recipient of complaints by several women about his behavior toward
them.[120]  One of the complaints led to an IAD investigation that
resulted in his demotion from sergeant to deputy and transfer to
another patrol location.[121]

On June 26, 2009, according to a report filed by another
deputy, Plaintiff Wilson received a call at 9:35 p.m., which he
returned at 9:45 p.m. and advised the complainant, whom he knew

---

[115]    See Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep.
pp. 83-84.

[116]    Id. p. 155.

[117]    See id. pp. 150-51, 153-54.

[118]    Id. p. 41.

[119]    See id. pp. 45-46.

[120]    See id. pp. 28-29, 32-40.

[121]    See id. p. 52.

personally, to wait to call the precinct until after Plaintiff
Wilson's shift ended at 10:00 p.m. because Plaintiff Wilson was
already home.[122]  On June 29, 2009, Plaintiff Wilson resigned from
his position with Precinct 3, citing personal reasons in his
written resignation.[123]   At his deposition, Plaintiff Wilson
testified that, although he disagreed with the other deputy's
account of what happened on June 26, 2009, he resigned under threat
of indictment by one of the precinct chiefs for refusing to take
that call.[124]

Plaintiff Wilson returned to full-time employment at Precinct
3 in January 2011.[125]   In June 2011, Plaintiff Wilson was
disciplined for going home sick without notifying anyone.[126]

On April 16, 2013, Plaintiff Wilson met with a investigator
from the Harris County District Attorney's office and an ADA, who
informed Plaintiff Wilson that they had "found almost a hundred
hours of conflicts between [his] County payroll and the Housing
Authority payroll . . . over a two-year period."[127]  Shortly after
that interview, Precinct 3 changed Plaintiff Wilson's assignments,

---

[122]   See id. pp. 49-50.

[123]   See id. p. 56.

[124]   See id. pp. 56-57.

[125]   See id. pp. 21-22.

[126]   See id. pp. 73-74.

[127]   Id. p. 62.

and he "had to pull double duty again."[128]

In the spring of 2013, Moore directed Plaintiff Wilson to quit his contract position with the HHA.[129]  Plaintiff Wilson expressed his concern that he was being treated less favorably than non-black officers, but he quit as directed.[130]  Within a month of that complaint, Plaintiff Wilson was terminated because he had been indicted on the charge of theft by public servant on the basis that the time he reported working for Precinct 3 overlapped with time he reported working for HHA.[131]  He was not given a written notice stating the reasons for his termination, was not given an opportunity to respond, and was not allowed to resign in lieu of termination.[132]  Defendant Jones designated Plaintiff Wilson's termination as a "Dishonorable Discharge" but promised Plaintiff

---

[128]    Id. pp. 68-69.

[129]    See id. pp. 99-100; Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 16.

[130]    See Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. p. 99; Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 16.

[131]    See Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶¶ 17, 18; but see Doc. 53-4, Ex. D to Pls.' Resp. in Opp. for Defs.' Mot. for Summ. J, Decl. of David J. Quan, Attach. 2, Indictment (stating that Plaintiff Wilson was indicting for, by virtue of his status as a public servant, "appropriat[ing], by acquiring and otherwise exercising control over property, namely, cash money, owned by Lance Gilliam, with the intent to deprive Lance Gilliam of said property, and cash money, owned by Curt Weller, with the intent to deprive Curt Weller of said property" in a total amount between $500 and $1500 cf. Doc. 53-4, Ex. D to Pls.' Resp. in Opp. for Defs.' Mot. for Summ. J., Decl. of David J. Quan, Attach. 1, Separation of Licensee (indicating June 25, 2013, as the date of separation).

[132]    See Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 17.

Wilson that he could be reinstated if he was found not guilty.[133]

Although the ADA pressured Plaintiff Wilson to enter a plea bargain and implicate Plaintiff Lindsey as complicit in Plaintiff Wilson's submission of conflicting timesheets, Plaintiff Wilson refused.[134]   On May 19-20, 2015, Plaintiff Wilson's case went to trial.[135]   Based on evidence from Precinct 3 commanders and officers that "it was a standard operating practice for officers at Precinct 3 to submit time sheets that did not accurately reflect the hours that they worked," the jury returned a verdict of not guilty.[136]

Nevertheless, Defendant Jones refused to change the designation of Plaintiff Wilson's discharge on a form filed with the Texas Commission on Law Enforcement.[137]   During negotiations with Defendant Jones after this lawsuit had been filed, he agreed to change the designation if Plaintiff Wilson dismissed this action.[138]   At an administrative hearing appealing the designation of his termination, Defendant Jones conceded that no evidence supported the "Dishonorable Discharge" designation in light of the

---

[133]   See id. ¶¶ 21, 24; Doc. 53-4, Ex. D to Pls.' Resp. in Opp. for Defs.' Mot. for Summ. J., Decl. of David J. Quan, Attach. 1, Separation of Licensee.

[134]   See Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 19.

[135]   See id. ¶ 20.

[136]   Id.

[137]   See id. ¶ 22.

[138]   See id.

not-guilty verdict and agreed to change it.[139]   Defendant Jones continued to deny Plaintiff Wilson reinstatement based on information learned after the criminal trial regarding Plaintiff Wilson's working as a security guard while working as a reserve deputy for Precinct 3 in early January 2011.[140]

**B.   Procedural Background**

Plaintiffs Lindsey and Wilson filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 19, 2014, and April 7, 2014, respectively.[141]   The EEOC sent Lindsey a Right to Sue letter dated December 10, 2014, and sent Wilson a Right to Sue letter dated February 5, 2015.[142]

Plaintiffs filed this lawsuit against Defendants on March 10, 2015.[143]   Both Plaintiffs alleged race discrimination, hostile work environment, and retaliation pursuant to Title VII and Sections 1981 and 1983, and Plaintiff Lindsey alleged age discrimination and retaliation pursuant to the ADEA.[144]   On June 24, 2015, Plaintiffs amended their complaint, adding factual detail and an FLSA collective action claim against Defendant Harris County and

---

[139]   See id. ¶ 23.

[140]   See id. ¶ 25.

[141]   See Doc. 1, Pls.' Compl. p. 2.

[142]   See Doc. 1, Pls.' Compl. p. 3.

[143]   See Doc. 1, Pls.' Compl.

[144]   See id. pp. 6-9.

Defendant Jones in his official capacity based on the failure to properly compensate Plaintiffs for overtime.[145]  Plaintiffs also clarified in the case style that the suit was against Defendants Jones and Harrison in both their individual and official capacities.[146]  Defendants filed an answer to the first amended complaint, asserting statutory damages caps, estoppel, and governmental, sovereign, and qualified immunity as defenses.[147]

On October 2, 2015, Plaintiffs filed a motion to conditionally certify a collective action.[148]  On November 5, 2015, Plaintiffs filed a second amended complaint to make word changes to the facts supporting the FLSA claim, for example, changing "work period" to "work week without being due overtime pay," and making changes to the proposed class description.[149]  On November 6, 2015, the court denied Plaintiffs' motion to certify because Plaintiffs failed to show either that there was a policy or plan to deny all officers overtime compensation or that the potential class contained

---

[145]     See Doc. 3, Pls.' 1st Am. Compl. pp. 9-11.  In the amendment, Plaintiffs sued Precinct 3 in addition to Harris County.  See id. p. 2.  On July 23, 2015, Precinct 3 filed a motion to dismiss on the basis that it lacked the legal capacity to sue or be sued.  See Doc. 8, Precinct 3's Mot. to Dismiss.  On August 14, 2015, Plaintiffs notified the court that they were unopposed to the motion, and the court dismissed Precinct 3.  See Doc. 16, Pls.' Statement of Non-Opp. to Precinct 3's Mot. to Dismiss; Doc. 17, Ord. Dated Aug. 14, 2015.

[146]     Doc. 3, Pls.' 1st Am. Compl. p. 1.

[147]     See Doc. 9, Defs.' Ans. p. 3.

[148]     See Doc. 21, Pls.' Mot. to Conditionally Certify Collective Action & Authorize Notice to Putative Class.

[149]     Compare Doc. 3, Pls.' 1st Am. Compl. p. 5 with Doc. 30, Pls.' 2nd Am. Compl. p. 5.

similarly situated individuals.[150]

On January 20, 2016, Defendant Harrison filed a motion for summary judgment.[151]  In April 2016, with permission of the court, Plaintiffs filed a third amended complaint to add allegations concerning Wilson's criminal trial and Defendants' allegedly retaliatory actions in response to the trial results.[152]  On the same day that the court granted leave to file the third amended complaint, Defendants filed an answer to Plaintiffs' second amended complaint, asserting the same defenses pled in their answer to Plaintiffs' first amended complaint with the addition of after-acquired evidence supporting the terminations.[153]

On May 20, 2016, Defendants collectively filed a motion for summary judgment.[154]  The court granted Plaintiffs an additional twenty days to respond.[155]  After resolving a discovery dispute, the court granted Plaintiffs another extension of time to respond to Defendants' motion for summary judgment.[156]  At the hearing on the

---

[150]   See Doc. 31, Mem. Op. Dated Nov. 6, 2015.

[151]   See Doc. 33, Def. Harrison's Mot. for Summ. J.

[152]   See Doc. 38, Pls.' 3rd Am. Compl. pp. 9, 13.  Plaintiffs, without explanation, also reverted back to the use of the term "work period" in place of "work week without being due overtime pay," a change they had made in the second amended complaint.  Compare id. p. 5 with Doc. 30, Pls.' 2d Am. Compl. p. 5.

[153]   See Doc. 40, Defs.' Ans. to Pls.' 2d Am. Compl. p. 3.

[154]   See Doc. 42, Defs.' Mot. for Summ. J.

[155]   Doc. 46, Ord. Dated June 3, 2016.

[156]   See Doc. 50, Min. Entry Ord. Dated June 23, 2016; Doc. 52, Ord. Dated June 27, 2016.

discovery dispute, the court mooted Defendant Harrison's earlier-filed motion for summary judgment without objection of any party.[157]

On July 6, 2016, Plaintiffs filed their responsive brief to Defendants' motion for summary judgment, and, on July 25, 2016, Defendants replied and filed joint objections to Plaintiffs' summary judgment evidence.[158]  On August 22, 2016, Plaintiffs filed a surreply with leave of court.[159]

The court now takes the pending motion for summary judgment under consideration, beginning with Defendants' objections to Plaintiffs' summary judgment evidence.

## II.   Objections to Summary Judgment Evidence

A party must support its factual positions on summary judgment by citing to particular evidence in the record.  Fed. R. Civ. P. 56(c)(1).  Federal Rule of Civil Procedure 56(c)(2) allows a movant to object to exhibits that "cannot be presented in a form that would be admissible in evidence" under the Federal Rules of Evidence.

Only relevant evidence is admissible.  Fed. R. Evid. 402. Relevant evidence has a "tendency to make a fact more or less

---

[157]    See Doc. 50, Min. Entry Ord. Dated June 23, 2016.

[158]    See Doc. 53, Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J.; Doc. 58, Defs.' Reply to Pls.' Resp. to Defs.' Mot. for Summ. J.; Doc. 59, Defs.' Jt. Objs. to Pls.' Summ. J. Evid.

[159]    See Doc. 60, Pls.' Mot. for Leave to File Surreply; Doc. 62, Ord. Dated Aug. 11, 2016; Doc. 63, Pls.' Surreply to Defs.' Reply to Pls.' Opp. to the Mot. for Summ. J.

probable than it would be without the evidence" and relates to a fact "of consequence in determining the action." Fed. R. Evid. 401. Affidavits supporting summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Conclusory allegations, unsubstantiated assertions, improbable inferences, and speculation are not competent evidence. Roach v. Allstate Indem. Co., 476 F. App'x 778, 780 (5th Cir. 2012)(unpublished)(citing S.E.C. v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1993)).

Hearsay is not admissible evidence. Fed. R. Evid. 802. Hearsay is a statement, not made while testifying in the current litigation, that is offered for "the truth of the matter asserted in the statement." Fed. R. Evid. 801. Statements offered against an opposing party that were made by "the party's agent or employee on a matter within the scope of that relationship" and statements "by the party in an individual or representative capacity" are not hearsay. Fed. R. Evid. 801(d)(2). The Federal Rules of Evidence also list twenty-nine exceptions to the rule against hearsay. Fed. R. Evid. 803-804, 807.

Although conclusory allegations, unsubstantiated assertions, improbable inferences, and speculation are not admissible, a party's subjective belief itself is not excluded under the Rules of

Evidence and may be relevant.   Whether subjective belief is admissible, for example to show motivation, is a different issue from whether it alone is sufficient evidence to  defeat summary judgment, which it is not.  Cf. Rodriguez v. Wal-Mart Stores, Inc., 540 F. App'x 322, 327 (5th Cir. 2013)(unpublished)("An employee's subjective belief is insufficient to establish discriminatory motive.")(citing Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996), superseded by statute on other grounds by 28 U.S.C. § 636(b)(1)); Delaval v. PTech Drilling Tubulars, L.L.C., 824 F.3d 476, 480 (5th Cir. 2016)(quoting EEOC v. La. Office of Cmty. Servs., 47 F.3d 1438, 1448 (5th Cir. 1995), overruled on other grounds)("A 'subjective belief of discrimination . . . cannot be the basis of judicial relief.'").

A party cannot defeat summary judgment by introducing an affidavit that impeaches, without explanation, prior deposition testimony.  S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996); see also Copeland v. Wasserstein, Perella & Co., 278 F.3d 472, 482 (5th Cir. 2002)(requiring an explanation when the only evidence creating a genuine issue of material fact to avoid summary judgment is an affidavit that conflicts with deposition testimony).

Both sides challenge evidence submitted by the other. Defendants object to portions of Plaintiffs' affidavits on the bases that they contain hearsay, they are conclusory and self-

serving statements that are not based on personal knowledge, and/or they contradict Plaintiffs' prior sworn testimony. Plaintiffs did not respond to these objections.

The court has reviewed all of the statements in Plaintiffs Lindsey and Wilson's declarations to which Defendants objected on the basis of hearsay and found that all are admissible. Several of the identified statements that the court finds admissible are not offered for the truth of the matters asserted, and others are attributable to Defendant Jones or other members of the command staff of Precinct 3.[160] All such statements fall outside the hearsay definition. Defendants' objections based on hearsay are **OVERRULED**.

The court has reviewed all of the statements in Plaintiffs Lindsey and Wilson's declarations to which Defendants objected on the basis that they contain conclusory and self-serving statements or subjective beliefs that are not based on personal knowledge and found that all except those listed below are admissible. The statements below are inadmissible because they lack the foundation for Plaintiff Lindsey or Plaintiff Wilson's personal knowledge, the foundation is not obvious, and the only apparent possible sources are hearsay and/or speculation. To the extent that other statements in the declarations include subjective beliefs for the

---

[160] The declarant is not always identified in the statements to which Defendants objected; however, the clear implication is that the information was provided to Plaintiff Lindsey, Plaintiff Wilson, or both by a supervisor or someone in the chain of command.

purpose of raising a fact issue on the ultimate issue of discrimination or retaliation, the court disregards them entirely in the summary judgment analysis.   The following statements are inadmissible:

<u>Plaintiff Lindsey</u>

- "[I]t was well-known that Chief Rabalais often said that 'no n[-----] will ever be allowed to be assigned to night shift.'"[161]

- "This led to employees having to report the number of hours worked without actually fully knowing how many hours that they had worked that pay period."[162]

- "The Precinct 3 management team knew that officers were working many hours beyond their scheduled shift, and expected its non-exempt officers to not fully report the time in which they were working."[163]

- "Both HHA and Precinct 3 were aware of the fact that I was working both jobs throughout the time that I was working for Precinct 3."[164]

<u>Plaintiff Wilson</u>

- "However, I knew that non-African American officers were not required to wait until they received such increases to their compensation."[165]

- "I knew that while I worked for Precinct 3 that non-African American officers who had similar or less experience and

---

[161]    Doc. 53-2, Ex. B to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Lindsey's Decl. ¶ 5.

[162]    <u>Id.</u> ¶ 11.

[163]    <u>Id.</u> ¶ 18.

[164]    <u>Id.</u> ¶ 20.

[165]    Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 3.

performance than me were being paid more money."[166]

- "It was well known that Chief Rabalais had told others that he did not like having 'n[******]' work on the night shift while he was in charge."[167]

- "Most of the officers at Precinct 3 held other jobs that they did when they were not working their duties for Precinct 3. While there was a form to obtain approval for extra jobs, it was not enforced and I knew that most of the officers did not update their approval requests."[168]

- "I knew that no non-African American officers were asked to give up their outside jobs and some had their Precinct 3 schedules adjusted so that their outside jobs could be accommodated."[169]

Defendants' objections based on lack of personal knowledge are **SUSTAINED IN PART AND OVERRULED IN PART.**

Defendants argue that the following two statements made by Plaintiff Wilson in his declaration contradict his deposition testimony to the effect that he had no personal knowledge whether others recorded time worked over their shift on their timesheets:[170]

- "Furthermore, while working at Precinct 3, it was the standard practice throughout the Precinct for all of the non-exempt officers to record having worked eight (8) hours each day and forty (40) hours each workweek, even if more hours were worked on a particular day or in that workweek."[171]

---

[166]   Id. ¶ 4.

[167]   Id. ¶ 5.

[168]   Id. ¶ 15.

[169]   Id. ¶ 16.

[170]   See Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. p. 110.

[171]   Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 9.

- "Because it was the standard practice to not report all of the hours worked in a day or in a workweek, I worked many hours 'off the clock.'"[172]

Plaintiff Wilson's declarations refer to a standard practice at Precinct 3 that overtime hours were not to be recorded. His lack of knowledge whether other officers followed that practice does not mean that they did not follow it. In other words, Plaintiff Wilson's declaration speaks to the generally known expectations of the command staff, not the behavior of the other officers. Plaintiff Wilson's declaration does not contradict his deposition testimony. Defendants' objections to these statements are **OVERRULED**.

Plaintiffs object to Defendants' submission, in reply to Plaintiffs' response, of the affidavit of Brian L. Rose ("Rose"), a Harris County ADA.[173] Defendants did not respond to these objections.

In his affidavit, Rose explained that the dates stamped as the filed date on Plaintiff Wilson and Nick Langanke's ("Langanke")[174] indictments were the respective dates that the grand jury returned

---

[172]    Id. ¶ 10.

[173]    Plaintiffs also object to Defendants' submission of new evidence, including both Rose's affidavit and Harrison's supplemental affidavit. As Plaintiffs have had the opportunity to respond to the additional evidence, the court will not strike the affidavits on the basis that they were not previously submitted.

[174]    Langanke was a non-African-American Precinct 3 employee who was indicted during the time Plaintiff Wilson was an employee and to whom Plaintiff Wilson points as a similarly situated individual who was treated differently.

the indictment and the indictments were made public.[175]   Rose further explained that both indictments also listed a date prepared, referencing the date that the secretary drafted the indictment, which did "not trigger any publicizing of the pending investigation or impending presentation to the grand jury."[176] According to Rose's testimony, Langanke's indictment was not made public until October 31, 2006.[177]

Plaintiffs argue that Rose's affidavit should be excluded because Defendants did not disclose Rose as a witness, because Rose's testimony is not based on personal information concerning the specific indictment at issue, and because Rose was not identified as an expert witness and, even if he had been, expert witness affidavits are not competent summary judgment evidence because they are not based on personal knowledge.

The court disagrees with Plaintiffs on all accounts.  With regard to the summary judgment process, Rose's affidavit was presented as rebuttal testimony and may be considered.  Should Defendants wish to have him testify at trial, they will need to include him on the trial witness list.  Rose's testimony was based on personal knowledge of the customs and practice of the Harris County District Attorney's Office.  The testimony did not include

---

[175]    See Doc. 58-3, Ex. C to Defs.' Reply to Pls.' Resp. to Defs.' Mot. for Summ. J., Aff. of Rose.

[176]    Id.

[177]    See id.

opinion testimony, as in that provided by an expert.  Plaintiffs'
objections are **OVERRULED**.[178]

### III.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that
no genuine dispute exists on any material fact and the moving party
is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Stauffer v.
Gearhart, 741 F.3d 574, 581 (5th Cir. 2014).  A material fact is a
fact that is identified by applicable substantive law as critical
to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal
Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine,
the dispute regarding a material fact must be supported by evidence
such that a reasonable jury could resolve the issue in favor of
either party.  See Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d
396, 400 (5th Cir. 2013)(quoting Anderson, 477 U.S. at 248).

The movant must inform the court of the basis for the summary
judgment motion and must point to relevant excerpts from pleadings,
depositions, answers to interrogatories, admissions, or affidavits
that demonstrate the absence of genuine factual issues.  Celotex
Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131

---

[178]    As explained in the remainder of this memorandum, the court finds
that whether Langanke was a similarly situated non-black employee who was treated
more favorably than Plaintiff Wilson under nearly identical circumstances is a
genuine issue of material fact.  Rose's testimony will be helpful to the jury in
deciding that fact but fails to definitively resolve the issue in Defendants'
favor.

(1992).  If the moving party carries its burden, the nonmovant may not rest on the allegations or denials in his pleading but must respond with evidence showing a genuine factual dispute.  Stauffer, 741 F.3d at 581 (citing Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)).

### III. Analysis

Defendants seek summary judgment on all of Plaintiffs' claims. Defendants contend that Plaintiffs cannot establish liability for race discrimination and retaliation, hostile work environment, age discrimination, or violations of the FLSA.  Defendants Jones and Harrison also raise qualified immunity and challenge the claims against them in their individual capacities.

Plaintiffs respond by arguing that genuine issues of material fact exist to prevent summary judgment on their race-discrimination claims of wrongful termination, discriminatory pay, and retaliation and on their FLSA claim for overtime pay.  However, Plaintiffs do not discuss Defendants' arguments on hostile work environment or age discrimination.  Nor do they address qualified immunity or individual capacity.  In Defendants' reply, Defendants point out Plaintiffs' failure to address the above-mentioned portions of Defendants' motion.  Although Plaintiffs filed a surreply, they again did not mention hostile work environment, age discrimination, qualified immunity, or individual capacity.

Accordingly, the court finds that Plaintiffs abandoned the

claims of hostile work environment and age discrimination.  Also, Defendants Jones and Harrison are entitled to qualified immunity on the Section 1983 claims of employment discrimination pursuant to Section 1981 because Plaintiffs failed to present evidence to counter Defendants Jones and Harrison's assertions of qualified immunity.  See McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002)(citing Behrens v. Pelletier, 516 U.S. 299, 309 (1996))(stating that a plaintiff cannot rest on his allegations when the adjudication of qualified immunity occurs on summary judgment but must present evidence that qualified immunity does not apply).  Furthermore, Plaintiffs' failure to address the arguments that Defendants Jones and Harrison cannot be held liable in their individual capacities reflects Plaintiffs' concession that they cannot maintain the employment-discrimination claims against Defendants Jones and Harrison in their individual capacities.

The remaining claims are Plaintiffs' Title VII and Section 1981 claims of wrongful termination, discriminatory compensation, and retaliation against Defendants Harris County and against Defendants Jones and Harrison in their official capacities and Plaintiffs' FLSA claims against Defendants Harris County and Jones in his official capacity.[179]  Claims against Defendants Jones and Harrison in their official capacities are the same as against

---

[179]    Defendants argue that Defendant Harrison does not fall within the FLSA's definition of "employer."  Plaintiffs did not assert an FLSA claim against Defendant Harrison.  See Doc. 30, Pls.' 2nd Am. Compl. p. 3.

Defendant Harris County.  See Goodman v. Harris Cty., 571 F.3d 388, 395 (5th Cir. 2009).  Thus, summary judgment should be granted in favor of Defendants Jones and Harrison as to all claims.  Defendant Harris County is the only remaining defendant on all of the claims.

## A.   Discrimination

Title VII prohibits employers from refusing to hire, terminating, or otherwise "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Section 1981[180] provides an additional avenue of recourse for persons who experience discrimination in employment because of race.  See 42 U.S.C. § 1981; Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 383 (2004).

Both types of claims share the central theme that the discrimination must be *because of* an identified protected characteristic.  Both types of claims also share the same rubric of analysis.  See Dilworth v. Continental Constr. Co., 282 F. App'x 330, 332 (5th Cir. 2008)(unpublished)(quoting Raggs v. Miss. Power & Light Co., 278 F.3d 463, 468 (5th Cir. 2002))("Claims of racial discrimination brought under Title VII or [Section] 1981 are

---

[180]   Section 1981 prohibits racial discrimination in the making or enforcing of contracts.  42 U.S.C. § 1981(a).  As defined by the statute, the phrase "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

considered 'under the same rubric of analysis'"); Meinecke v. H & R Block of Houston, 66 F.3d 77, 83 (5th Cir. 1995)(citing cases)("The same evidentiary procedure for allocating burdens of proof applies to discrimination claims under both statutes.").

A plaintiff may prove a discrimination claim either through direct or circumstantial evidence. Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000). In the absence of direct evidence, courts analyze discrimination claims under the burden-shifting approach first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and modified in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), and Rachid v. Jack In The Box, Inc., 376 F.3d 305 (5th Cir. 2004). Under this "modified McDonnell Douglas approach," a plaintiff may trigger a presumption of discrimination by establishing a prima facie case. Rachid, 376 F.3d at 312.

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to proffer legitimate, nondiscriminatory reasons for its actions. Alkhawaldeh v. Dow Chem. Co., ___ F.3d ___, 2017 WL 1018340, at *2 (5th Cir. Mar. 15, 2017)(slip copy). If the defendant satisfies this burden, then the onus is back on the plaintiff to establish pretext. See id.

## 1. Termination

A prima facie case of discriminatory termination based on disparate treatment requires the plaintiff to show that he: 1) is

40

a member of a protected class; 2) was qualified for his position;
3) suffered an adverse employment action; and 4) "was treated less
favorably than others similarly situated outside of his protected
class." Id.  "The 'similarly situated' prong requires a Title VII
claimant to identify at least one coworker outside of his protected
class who was treated more favorably 'under nearly identical
circumstances.'" Id. (quoting Lee v. Kan. City S. Ry. Co., 574 F.3d
253, 259 (5th Cir. 2009)).  If the identified comparator does not
hold the same job position, does not have the same work
responsibilities, does not report to the same supervisor, or does
not have a similar history of infringements, his more favorable
treatment was not under nearly identical circumstances. See id. at
259-60.  However, "nearly identical" is not synonymous with
"identical." Lee, 574 F.3d at 260.

The first three elements of the prima facie case are not in
issue here.  The dispute is whether Plaintiffs were treated less
favorably than similarly situated non-black employees with regard
to their terminations.

### a.  Plaintiff Lindsey

Plaintiff Lindsey identified Ray Lacy ("Lacy") as an officer
whom the IAD investigated and found to have tampered with official
documents.[181]  However, he was not charged and was allowed to resign

---

[181]   See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep.
pp. 45-46.

rather than be terminated.[182]

Plaintiff Lindsey and Ray Lacy were both officers who were accused of tampering with an official document but were treated differently.  This is sufficient evidence to raise a question of fact on the fourth element of the prima facie case.[183]

### b.  Plaintiff Wilson

Plaintiff Wilson identified Langanke as a similarly situated officer who was accused of "double dipping," as in recording certain hours at both Precinct 3 and an extra job.[184]  Langanke was the subject of an investigation and was indicted on the charge of theft by public servant.[185]  According to Wilson, Precinct 3 did not fire Langanke but let him retire or resign without designating his separation as dishonorable.[186]  The separation paperwork indicated that Defendant Harris County terminated Langanke under the designation "Generally Discharged."[187]  The explanation of the

---

[182]   See id.

[183]   As the court finds that Lacy provides a similarly situated non-black employee who was arguably treated more favorably than Plaintiff Lindsey, the court need not make rulings on Plaintiff Lindsey's allegations that Garland, Casey Dobbins, and Bobby Thurman were comparators who were also treated more favorably.

[184]   See Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. p. 87.

[185]   See id.; Doc. 42-6, Ex. 22 to Defs.' Mot. for Summ. J., Langanke Indictment.

[186]   See Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. p. 87.

[187]   Doc. 42-6, Ex. 23 to Defs.' Mot. for Summ. J., Report of Separation of Licensee Langanke.

designation stated the he "left the agency while under investigation for a criminal violation or in lieu of disciplinary action including suspension, demotion or termination."[188]

Plaintiff Wilson and Langanke were investigated and indicted for the same felony charge.  As suggested by Plaintiff Wilson, the narrative on Langanke's separation paperwork is ambiguous as to whether Langanke was actually terminated or was simply allowed to resign.  Additionally, Langanke was given a more favorable designation of separation.  This is sufficient evidence to raise a question of fact on the fourth element of the prima facie case.[189]

### 2.  Compensation

A claim of discriminatory compensation requires proof that the plaintiff is a member of a protected class and that he is paid less than another employee not within the protected class for work "requiring substantially the same responsibility."  Taylor v. United Parcel Serv., Inc., 554 F.3d 510, 522 (5th Cir. 2008).  The plaintiff must show that his circumstances are "nearly identical" to the more highly paid employee.  Id. at 523.

### a.  Plaintiff Lindsey

Plaintiff Lindsey identified Rabalais and Casey Dobbins

---

[188]   Id.

[189]   As the court finds that Langanke provides a similarly situated non-black employee who was arguably treated more favorably than Plaintiff Wilson, the court need not make rulings on Plaintiff Wilson's allegations that Dobbins, William McMorrow, and Jose Zamudio were comparators who were also treated more favorably.

("Dobbins") as non-black officers who, unlike Plaintiff Lindsey, received increases in pay when they were promoted.[190]   Plaintiff Lindsey further testified that Rabalais' certification was at the basic level, whereas Plaintiff Lindsey possessed a master peace officer certificate.[191]   Plaintiff Lindsey also stated that the management team took his field training officer ("FTO") pay and gave it to Dobbins when Dobbins was promoted to sergeant.[192] Plaintiff Lindsey confronted Gary Jones, who said, "I'm promoting you to lieutenant and I'm taking your FTO pay and I'm giving it to Dobbins because we're promoting him to sergeant."[193]

The evidence includes salary histories for Plaintiffs and other officers.[194]   Even if the salary histories were sufficient to raise a question on discrepancies in pay, they do not provide sufficient evidence of nearly identical circumstances in terms of training, work responsibilities, discipline histories, and other areas.   However, Plaintiff Lindsey's testimony to the effect that Rabalais and Dobbins received pay raises upon promotion when Plaintiff Lindsey did not does allow for an inference of

---

[190]   Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 33.

[191]   See id.

[192]   See id. p. 68.

[193]   Id. p. 69.

[194]   See Doc. 53-4, Ex. D to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Decl. of David J. Quan, Attach. 4, Current Employees' Change of Status Histories.

discriminatory treatment under nearly identical circumstances.

This is sufficient evidence to raise a question of fact on discriminatory pay.

### b. Plaintiff Wilson

Plaintiff Wilson identified Dobbins, Jeremy McCaffrey ("McCaffrey"), Garland, and Kevin Taylor ("Taylor") as similarly situated individuals who were paid more than he was with lesser qualifications.[195] Plaintiff Wilson stated that, based on what he knew about Dobbins prior work history, it did not appear that Dobbins had any prior experience in law enforcement.[196]

Plaintiff Wilson relies on the salary histories, which, as previously stated, do not raise a fact issue on nearly identical circumstances. Plaintiff Wilson's own testimony is too thin to clear the "nearly identical" bar.

Plaintiff Wilson fails to raise a fact issue on discriminatory compensation.

### 3. Pretext

Plaintiffs agree that Defendant Harris County's explanation for Plaintiffs' terminations is sufficient to satisfy the burden of producing legitimate, nondiscriminatory reasons for its actions but argue that the evidence raises fact questions on pretext.

---

[195]   See Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. pp. 22-24.

[196]   See id. p. 22.

Plaintiffs identified Gary Jones, Garland, Moore, and Wooten as persons who told racist jokes, made racially disparaging remarks, and/or referred to blacks in offensive terms.  Plaintiffs also pointed to other incidents of disparate treatment they experienced while employed at Precinct 3.  In addition to that testimony and Plaintiffs' allegations of disparate treatment with regard to their terminations, they provide other evidence of disparate treatment suggesting racial pretext.

### a.  Plaintiff Lindsey

Plaintiff Lindsey identified Defendant Harrison and Lacy as non-black officers who were hired as lieutenants.[197]  According to Plaintiff Lindsey, their training and experience was no different than his.[198]  Plaintiff Lindsey also stated that Rabalais was promoted through the ranks from sergeant to lieutenant to captain to chief while Plaintiff Lindsey was never promoted higher than lieutenant.[199]  In addition to himself, Plaintiff Lindsey identified three other black officers who were not given pay raises upon promotion in rank.[200]

---

[197]   See Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 45.

[198]   See id.

[199]   See id. p. 46.

[200]   See id. p. 66.  Plaintiff Lindsey also identified two non-black officers who were not give pay raises upon promotion in rank.  See id. p. 67. Regarding the practice occurring across race lines, Plaintiff Lindsey said:

> I think it's a selective process. I think it's a — because there is
> no promotion procedure, there is no promotion process.  So I think

Plaintiff Lindsey identified Jose Zamudio and William McMorrow as non-black officers who were accused of double dipping on pay from Precinct 3 and second jobs.[201]  They were not disciplined but were allowed to repay their second employer for the time they were overpaid.[202]  Plaintiff Lindsey also testified that, in 2012, Moore, Garland, Dobbins, Rabalais, and other non-black officers worked the polls during the primary and general elections as extra work during hours that they reported on their timesheets at Precinct 3.[203]  Plaintiff Lindsey identified Rabalais as having worked a seasonal second job for a fireworks business while on duty at the Precinct.[204]

Plaintiff Lindsey described a pattern of pulling a black officer from assignments that involved white citizens who were friends of Defendant Jones or David Franklin ("Franklin").[205]  If a white officer was not available for the assignment, "the black deputy had to follow certain instructions to make sure the matter

---

to promote anybody, especially blacks, and giving them the responsibility and not paying them is very demeaning.  Now, I don't know what the white officers' arrangements were and don't care.  But me personally, to promote me and use me and then fire me for being a supervisor and not pay me for being one, that's very disheartening.

Id. pp. 67-68.

[201]    See id. p. 35.

[202]    See id.

[203]    See id. pp. 59-61.

[204]    See id. pp. 61-62.

[205]    See id. p. 47.

47

was resolved amicably and in favor of the Caucasian citizen."[206]
Plaintiff Lindsey said the opposite was also true; a black deputy
was sent in the place of a white officer when the incident involved
a black citizen.[207]

This testimony is sufficient to create a fact issue on whether
Defendant Harris County's stated reason for terminating Plaintiff
Lindsey was a pretext for discrimination based on race.

### b.  Plaintiff Wilson

Plaintiff Wilson identified Dobbins, McCaffrey, Garland, and
Taylor as similarly situated individuals who received promotions
while Plaintiff Wilson remained at the rank of deputy for his
entire tenure.[208]   Plaintiff Wilson identified the same four
officers as individuals who were given special consideration in
assignments to accommodate their extra jobs.[209]   Plaintiff Wilson
also stated that Garland and Mike Parsons ("Parsons") were never
told to quit working their extra jobs.[210]   Plaintiff Wilson
testified that white deputies routinely left their Precinct 3
duties to work extra jobs, but Plaintiff Wilson received a written

---

[206]     Id.

[207]     See id. p. 48.

[208]     See Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep.
pp. 22-24.

[209]     See id. pp. 22-25.

[210]     See id. p. 101.

warning for doing so.[211]  Plaintiff Wilson also identified Parsons as an officer who was accused of double dipping, was investigated, and was found to be in violation of the rules but was reassigned rather than terminated.[212]

Plaintiff Wilson identified Dobbins, McCaffrey, Garland, and Taylor as individuals who were disciplined more leniently than Plaintiff Wilson.[213]  For example, a woman called the police to protect her from Plaintiff Wilson, and he was required to write a statement for Precinct 3.[214]  Plaintiff Wilson said that white employees did not have to write statements when they "did things worse[;] they just [got] questioned about it and they covered up for them. . . . Always."[215]

He also testified that Franklin intimidated Plaintiff Wilson when giving him a written notice for violating the precinct rules by working apartment security in exchange for a rent-free apartment and for improper conduct by using the apartment to meet women.[216]  Plaintiff Wilson said that, at that time, McCaffrey "had an apartment" and that Precinct 3 command staff knew about it but did

---

[211]   See id. pp. 46-47.

[212]   See id. pp. 96-97.

[213]   See id. pp. 22-24.

[214]   See id. pp. 28-29.

[215]   Id. p. 29.

[216]   See id. pp. 41-42.

49

not take any disciplinary action against McCaffrey.[217]

Plaintiff Wilson stated that it was "standard practice for everybody" to go home during a shift, but he was disciplined when he was not feeling well and went home to take medication.[218]   He specifically identified Garland as a non-black officer who, while on duty, went home to feed and train his horses and instructed another officer to take any calls while he was gone.[219]

Plaintiff Wilson stated that Wooten yelled at Plaintiff Wilson after he was involved in a road rage incident.[220]   Plaintiff Wilson had two issues with Wooten's rebuke:   (1) "I don't think Chief Wooten would have said nothing to a white deputy;" (2) Wooten told Plaintiff Wilson, "[S]he's an older white woman.  Here you are the big black guy with all these muscles.  She's saying you look like some gorilla."[221]

Plaintiff Wilson identified Joe Flanagan, McCaffrey, and Tommy Kelly as officers who were arrested, stopped for driving while intoxicated, and caught speeding in the parking lot in a county car, respectively, and who were not terminated.[222]   Plaintiff Wilson

---

[217]     See id. p. 43.

[218]     Id. p. 76.

[219]     See id. p. 88.

[220]     See id. pp. 77-82.

[221]     Id. pp. 82-83.

[222]     See id. pp. 87-88.

also identified Lacy as someone who was accused of "stealing training hours" and was allowed to resign without a designation of dishonorable termination.[223]  Plaintiff Wilson identified Dobbins, McCaffrey, Garland, and Taylor as individuals who received more favorable work assignments than Plaintiff Wilson.[224]

This testimony is sufficient to create a fact issue on whether Defendant Harris County's stated reason for terminating Plaintiff Wilson was a pretext for discrimination based on race.

## C.  Retaliation

To establish a prima facie case of retaliation, a plaintiff must prove: (1) that he participated in a protected activity; (2) that he suffered an adverse action; and (3) that there was a causal connection between the protected activity and the adverse action. Buckhanan v. Shinseki, 665 F. App'x 343, 346-47 (5th Cir. 2016)(unpublished); Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 439 (5th Cir. 2005).  Protected activity includes complaining to supervisors about acts of unlawful discrimination.  See 42 U.S.C. § 2000e-3(a).

### 1.  Plaintiff Lindsey

Plaintiff Lindsey testified that he complained to Moore in 2009 or 2010 about an officer who made "disparaging racial remarks

---

[223]   Id. p. 97.

[224]   See id. pp. 22-25.

about minorities and females."[225]   Plaintiff Lindsey said that he also complained to Defendant Harrison in 2012 about being asked to attend a investigatory meeting regarding a complaint against Plaintiff Wilson on the basis that Plaintiff Lindsey was a black supervisor.[226]   Plaintiff Lindsey told Defendant Harrison that he was not Plaintiff Wilson's supervisor and "felt used as a black person, supervisor, having to sit in on this complaint just because these white folks had filed a complaint on [Plaintiff Wilson]."[227] In May 2013, when Defendant Harrison notified Plaintiff Lindsey that he would need to resign from his HHA employment, Plaintiff Lindsey told Defendant Harrison "that this whole effort and everything [Plaintiff Lindsey] was going through . . . was racially motivated."[228]

The only one of these three complaints that was made to a supervisor was the 2009 or 2010 complaint, which was too far removed from Plaintiff Lindsey's termination to be considered causally connected to his 2013 termination.  The first complaint made to Defendant Harrison was during the investigation of a complaint against Plaintiff Wilson and was also too far removed from Plaintiff Lindsey's termination to be causally connected.  The

---

[225]     Doc. 42-1, Ex. A to Defs.' Mot. for Summ. J., Pl. Lindsey's Dep. p. 39.

[226]     See id. p. 52.

[227]     Id. p. 53.

[228]     Id. p. 91; see also id. p. 85.

second complaint to Defendant Harrison was also made to him in his role as IAD investigator regarding the Utley complaint against Plaintiff Lindsey. Plaintiff Lindsey has failed to establish that Defendant Jones had knowledge of Plaintiff Lindsey's complaint of race discrimination, much less that the complaint was causally connected to his decision to terminate Plaintiff.

Plaintiff Lindsey fails to raise a fact issue on retaliation.

### 2. Plaintiff Wilson

Plaintiff Wilson stated in his declaration that he complained to Moore that he was being treated less favorably than non-black officers when he was told to resign his HHA employment.[229] Although Moore may have been a supervisor, Plaintiff Wilson makes no effort to connect this complaint or discrimination to Defendant Jones's decision to terminate Plaintiff Wilson's employment upon the intervening issuance of an indictment against Plaintiff Wilson.

Plaintiff Wilson fails to raise a fact issue on retaliation.

## C. FLSA

The FLSA generally requires employers to compensate employees at a rate of not less than one-and-one-half times the regular hourly rate for the hours worked in excess of forty per week. See 29 U.S.C. § 207(a)(1); Coffin v. Blessey Marine Servs., Inc., 771 F.3d 276, 279 (5ᵗʰ Cir. 2014). An action for unpaid overtime

---

[229] See Doc. 53-1, Ex. A to Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J., Pl. Wilson's Decl. ¶ 16.

compensation requires proof of: (1) "an employer-employee relationship during the unpaid overtime periods claimed;" (2) FLSA coverage of the plaintiff's activities; (3) the employer's violation of the FLSA's overtime wage requirements; and (4) the amount of overtime compensation owed. Johnson v. Heckmann Water Res. (CVR), Inc., 758 F.3d 627, 630 (5th Cir. 2014). An FLSA plaintiff bears the burden of proof on all elements of his claim. Samson v. Apollo Res., Inc., 242 F.3d 629, 636 (5th Cir. 2001).

"An employee bringing an action pursuant to the FLSA, based on unpaid overtime compensation, must first demonstrate that [he] has performed work for which [he] alleges [he] was not compensated." Iheqword v. Harris Cty. Hosp. Dist., 555 F. App'x 372, 374 (5th Cir. 2014)(unpublished)(quoting Harvill, 433 F.3d at 441). A plaintiff may rely on the employer's records if they are "proper and accurate" or, if the records are "inaccurate or inadequate," may produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Rosales v. Lore, 149 F. App'x 245, 246 (5th Cir. 2005)(unpublished)(quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946)); see also Iheqword, 555 F. App'x at 374.

If the plaintiff carries his burden, the burden shifts to the employer to produce either "evidence of the precise amount of work performed" or evidence that counters the reasonableness of drawing an inference in favor of the plaintiff. Iheqword, 555 F. App'x at

374 (quoting <u>Harvill</u>, 433 F.3d at 441); <u>Rosales</u>, 149 F. App'x at 246 (quoting <u>Mt. Clemens Pottery Co.</u>, 328 U.S. at 687-88).  The employer's failure to meet the shifted burden results in an award of damages to the plaintiff, even if the amount of the award is only approximate.  <u>Iheqword</u>, 555 F. App'x at 374 (quoting <u>Harvill</u>, 433 F.3d at 441).

As the first two elements of the FLSA claim are not at issue, Plaintiffs must provide evidence of Defendant Harris County's failure to follow the FLSA's overtime wage requirements and evidence of amount of overtime owed.  On the first issue, Plaintiffs testified that they were informed to record no more than eight hours per day and forty hours per week.  When they exceeded forty hours in a week, they testified, they were told to record their regularly scheduled work hours and to take comp time the following day.  However, according to their testimony, they were often unable to take comp time in the same week it accrued or were unable to take it at all.  At his deposition, Plaintiff Wilson opined that the Precinct 3 timesheets were not dependable because of the policy of completing them according to the hours scheduled to work rather than the hours actually worked.[230]

Plaintiffs' testimony is sufficient to raise a fact question on Defendant Harris County's compliance with the FLSA and on the

---

[230]  <u>See</u> Doc. 42-10, Ex. J to Defs.' Mot. for Summ. J., Pl. Wilson's Dep. pp. 129, 132, 140.

inaccuracy of the time records.  Plaintiffs also testified about the type of assignments that led to the accumulation of overtime hours, such as calls late in the shift, supervisory duties, and community events.  Defendants do not produce evidence of the precise amount of work performed by Plaintiffs, relying instead on the timesheets and their contention that no supervisor knew of the alleged overtime violations.  Plaintiffs' testimony on the widespread policy is more than sufficient to carry this case to trial.

## IV.  Conclusion

Based on the foregoing, the court **GRANTS IN PART AND DENIES IN PART** Defendants' motion.  The remaining claims are Plaintiffs' claims against Defendant Harris County for wrongful termination and FLSA overtime wage violations, as well as Plaintiff Lindsey's claim against Defendant Harris County for discriminatory compensation.

**SIGNED** in Houston, Texas, this 29th day of March, 2017.

_____
U.S. MAGISTRATE JUDGE